# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| MARTY GINSBURG, PATRICIA ODENBACH, DANIEL SAYLE, JOSEPH LOTT, TERRI LOTT, ARIEL YOUNG, RONALD MARTIN, SHARON MARTIN, WILLIAM STAGE and BARRY GINSBURG, <br><br> Plaintiffs, <br><br> v. <br><br> INBEV NV/SA, ANHEUSER-BUSCH COMPANIES, INC., and ANHEUSER-BUSCH, INC., <br><br> Serve: <br> InBev NV/SA <br> Brouwerijplein 1 <br> B-3000 Leuven <br> Belgium <br><br> Anheuser-Busch Companies, Inc. <br> and Anheuser-Busch, Inc. <br> One Busch Place <br> St. Louis, MO 63118 <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 U.S.C. §18** |

## COMPLAINT

Plaintiffs Marty Ginsburg, Patricia Odenbach, Daniel Sayle, Joseph Lott, Terri Lott, Ariel Young, Ronald Martin, Sharon Martin, William Stage and Barry Ginsburg (hereinafter "Plaintiffs") by and through their undersigned attorneys, bring the following Complaint against Defendants InBev NV/SA (hereinafter "InBev"), Anheuser-Busch

Companies, Inc., and Anheuser-Busch, Inc. (hereinafter collectively referred to as "Anheuser-Busch"), and allege as follows:

## SUMMARY OF ACTION

1.      This is a private antitrust suit brought under Section 16 of the Clayton Antitrust Act (15 USC §26) to permanently prohibit the proposed acquisition by InBev, the largest brewer in the world, of Anheuser-Busch, the largest brewer in the United States, for $52 Billion, the largest cash payment ever offered to purchase a competitor, as a plain violation of Section 7 of the Clayton Antitrust Act (15 USC §18), in that the acquisition may, and most probably will, substantially lessen competition and/or tend to create a monopoly in the production and sale of beer in the United States, the most profitable beer market in the world.

2.      Anheuser-Busch and InBev agreed that if one of them failed to go forward with the illegal acquisition, it would have to pay the other $1,250,000,000 as punishment for withdrawing. This "fine" binds the defendants to their unlawful enterprise.

3.      The plaintiffs are consumers and purchasers of Anheuser-Busch's beers who are threatened with loss and damage in the forms of higher prices, fewer services, fewer competitive choices, deterioration of products and product diversity, suppression and destruction of smaller actual competitors through exclusive distribution, full-line forcing, and the like, and other anticompetitive effects and consequences that may, and most probably will, result from the elimination of the actual and potential competition of InBev if the acquisition were to be consummated. Indeed, shortly after their agreement, the Chief Executive Officers of InBev and Anheuser-Busch, Carlos Brito and August Busch IV, assured the Anheuser-Busch distributors that to get "that extra buck" -- and

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

2

even though "the consumer is getting pressure especially the blue collar consumer" -- substantial price increases would be instituted in the fall of this year, 2008, to secure the margins of the exclusive distributors as well as the proposed new combine.

4.      More than 40% of the population of the United States are consumers of beer, including the beers of Anheuser-Busch and InBev, and each will be adversely affected if the proposed unlawful transaction were allowed to proceed.

5.      Anheuser-Busch is, and has been since 1957, the largest brewer in the United States. Anheuser-Busch has almost 50% of the market. Two of its over 100 plus products, Bud Light and Budweiser, are the largest selling beers in the world, and are sold in 80 different countries. Last year, Anheuser-Busch produced almost 4 Billion gallons of beer, with revenues of $16.7 Billion and earnings of approximately $2.5 Billion. Anheuser-Busch has 12 breweries in the United States, 27 breweries worldwide. Anheuser-Busch employs more than 30,000 people, spends more than $375 Million a year on advertising, more than all of its competitors combined, and has contributed almost $400 Million to local charities over the past decade. Anheuser-Busch distributes its products through more than 600 "independent" distributors, almost all of whom agreed to exclusive contracts which divide geographical territories in which they can sell, and which prohibit them from distributing the products of competitors.

6.      InBev is the largest brewer in the world. It produces the number one or number two beer in 20 key beer markets throughout the world, particularly Europe and South America. InBev produces more than 200 brands of beer brewed in 123 breweries worldwide. Last year, InBev produced more than 7 Billion gallons of beer, with revenues of $21.2 Billion and earnings of $7.8 Billion. It employs more than 89,000 people.

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

3

InBev is the result of multiple mergers and acquisitions, the most recent being the combination of Belgium's Interbrew and Brazil's AmBev. More than 52% of InBev is still owned by the founding families of InBev in Belgium and Brazil.

7.    In the United States, the largest and the most profitable beer selling market in the world and InBev's most targeted market, Anheuser-Busch, with 50% of the market, is more than 2½ times as large as it closest United States competitor, SABMiller (formed from the combine of South Africa Brewing and Miller), which has 19% of the market; 4½ times as large as the third largest competitor in the United States, Molson Coors (formed from the combine of Canadian Molson and Coors), which has 11% of the market; 3½ times as large as all imported beers, which have a total of 14.5% of the market; and 7 times as large as all domestic craft or microbrewery beers, which have a total of 7% of the market. Furthermore, in addition to Anheuser-Busch's secondary brands which are the largest sellers in their categories of sub-premium, imports, and micro, Anheuser-Busch successfully staved off, at least for now, the potential foreign competition coming into the United States from the north, south, east and west by securing exclusive anti-competitive market division distribution agreements with the largest brewers of the largest selling beers in Canada, Mexico, Europe, and China, giving Anheuser-Busch the exclusive rights to sell their beers in the United States in exchange for giving them the exclusive rights to sell the beers of Anheuser-Busch in their countries.

8.    Recently, the number two and number three competitors in the United States, SABMiller and Molson Coors, combined their American businesses, (without objection from a compliant anti-enforcement Antitrust Division of the Department of

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

4

Justice),[1] and now account for 30% of the market. Consequently, with Anheuser-Busch's 50% of the US market, more than 80% (some analysts say 90%) of the production and sale of beer in the United States is controlled by only two companies, substantially increasing the probability of price increases; product, service and choice deterioration; price-fixing; elimination of small and regional competitors; control and monopolization of distribution and retail channels; and other probable anticompetitive effects.

9.     The United States is the most profitable beer market in the world.

10.    The United States market is substantially more than simply "highly concentrated," as measured by the objective standards of the universally accepted Herfindahl-Hersch Index ("HHI"). (HHI measures and grades market concentration by adding the squared market share percentages of each of the competitors in the market.) The threshold for "highly concentrated" is 1800. An additional 100 points causes great concern among antitrust enforcers. Here, the market substantially exceeds that number, especially since the recent marketing combination of SABMiller and Molson Coors in the United States.

11.    The HHI is 3093, plainly a market ripe for probable if not certain collusion and a galloping tendency toward monopoly. Although the HHI remains the same if InBev acquires Anheuser-Busch, the economic power and strength of the leading firm is substantially increased and allows it to dominate the field.

---

[1] In April 2008 the Chairman of the Judiciary Committee of the House of Representatives, Representative. John Conyers, made the following comment about the present Antitrust Division of the Department of Justice: "We have an Antitrust Division that approved mergers left and right frequently overturning judgments of the career staff of the Department of Justice. The Department has not attempted to block or modify any major merger over the past seven years, including some of the largest, controversial mergers among direct competitors .... The Department hands off approach has even encouraged companies with questionable merger justifications to give it a try. And some analysts have stated that the government has nearly stepped out of the antitrust enforcement business leaving companies to mate with whom they wish." Introductory remarks, April 24, 2008, hearings on the "Northwest/Delta Airlines merger."

COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18

5

12. On many occasions, InBev has announced its intention to enter the United States market.

13. Anheuser-Busch has been well aware of InBev's intention to enter the United States market, and specifically so stated and represented to the United States District Court.

14. InBev is well equipped and well financed to be able to enter the market de novo, building its own breweries and establishing its own national distribution network.

15. InBev's presence on the periphery of the market - as a perceived potential and actual entrant as well as a potential and actual dominant entrant - has been an important consideration in the pricing and marketing decisions of Anheuser-Busch and other American brewers or importers in the United States.

16. If InBev is allowed to purchase Anheuser-Busch, there no longer would be any significant major potential competitor to influence pricing and marketing practices in the United States anywhere near the degree to which InBev, as the largest brewer in the world, is able to do; the beer market in the United States would be controlled by absentee foreign owners; consumer welfare and choice and the benefits of competition would be substantially lessened and tend toward the creation of a monopoly; and prices would be artificially enhanced and raised and extracted without regard to supply, demand and competition on the merits.

17. InBev, although not competing directly in the United States beer market, is so situated as to be a potential competitor and likely to exercise substantial influence on the market behavior of those brewers in the market.

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

6

18.     Entry into the United States beer market by InBev through the acquisition of Anheuser-Busch – although its competitive conduct may be the mirror image of that of Anheuser-Busch – completely eliminates the potential major competitor exercising present influence on the market.

19.     InBev is an aggressive, well equipped and well financed corporation engaged in the same line of commerce as Anheuser-Busch and anxiously intends to enter the oligopolistic market in the United States. As such, InBev is a substantial incentive to competition in the United States. The constant threat of InBev, the largest brewer in the world, to enter the market has a direct and substantial effect and impact on the market behavior of Anheuser-Busch and other brewers in the United States beer market.

**JURISDICTION**

20.     This action is brought under Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26, to prevent the Defendants from consummating the acquisition as a violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. §18. This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26, and Title 28 United States Code Sections 1331 and 1337.

**PARTIES**

*The Plaintiffs*

21.     Each of the plaintiffs named herein, Marty Ginsburg, Patricia Odenbach, Daniel Sayle, Joseph Lott, Terri Lott, Ariel Young, Ronald Martin, Sharon Martin, William Stage and Barry Ginsburg, is an individual and a citizen of the State of Missouri, and in the four years prior to the filing of this action, each plaintiff has purchased beer

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

7

produced by one or both of the defendants, and each plaintiff expects to continue to purchase beer produced by one or both of the defendants in the future.

**_The Anheuser-Busch Defendants_**

22.     Anheuser-Busch Companies, Inc. is a Delaware Corporation with its principal place of business in St. Louis, Missouri, that was organized in 1979 as a holding company of Anheuser-Busch Incorporated, a Missouri corporation whose origins date back to 1875. In addition to Anheuser-Busch Incorporated, which is the nation's largest brewer of beer, including Budweiser, Bud Light, and the Michelob family of beers, the company also has subsidiaries that conduct various other business operations including theme park and aluminum can manufacturing. Anheuser-Busch Incorporated operates 12 breweries in the United States, including its main brewery in St. Louis, Missouri, and more than 15 breweries outside the United States. As of December 31, 2007, Anheuser-Busch had more than 30,000 full-time employees worldwide.

23.     Since 1957 Anheuser-Busch has been and is the largest producer and seller of beer in the United States.

24.     Anheuser-Busch brews more than 100 brands of beer, including Budweiser and Bud Light, which are the largest selling beers in the world. They are sold in at least 80 countries around the world.

25.     Anheuser-Busch is the largest seller of beer in all major domestic beer categories: premium light, premium regular, imports, sub-premium, and specialty beers.

26.     Bud Light is the largest selling beer brand in the world.

27.     Budweiser is the second largest selling beer brand in the world.

28.     Anheuser-Busch, as the largest brewer in the United States, has almost 50% share of the beer market.

29.     The United States is the world's most profitable beer market.

30.     Anheuser-Busch operates 12 breweries in the United States with its main brewery in St. Louis, Missouri.  The 12 breweries are located in Missouri, New Jersey, California, Texas, Ohio, Florida, New Hampshire, Virginia, New York, Colorado and Georgia.

31.     In addition to its American breweries, Anheuser-Busch operates more than 15 breweries outside the United States, including breweries in the United Kingdom, China and India.

32.     Anheuser-Busch also produces its products internationally under contract in Argentina, Canada, China, India, Italy, Ireland, Japan, Panama, Russia, South Korea, Spain and the United Kingdom.  Anheuser-Busch International Inc. is a business unit of Anheuser-Busch Incorporated.

33.     Anheuser-Busch has international offices in Argentina, Canada, nine cities in China, England, Guam, Ireland, India, Italy, Japan, Mexico, Panama, Russia, Spain and Taiwan.

34.     Anheuser-Busch's international headquarters and its related entity, Anheuser-Busch International, Inc., is headquartered in St. Louis, Missouri.

35.     Anheuser-Busch owns a half-stake (50%) in Mexican brewer Grupo Modelo which brews many popular brands including Corona, Corona Extra, Victoria, and Pacifico. ·

36.     Grupo Modelo has approximately 62% of the market for production and sale of beer in Mexico. Anheuser-Busch is the exclusive importer of Modelo beer in the United States.

37.     Anheuser-Busch owns a 27% share in Tsingtao, whose namesake beer is China's best-selling premium beer. Anheuser-Busch is the exclusive importer of Tsingtao beer in the United States.

38.     Anheuser-Busch has the country's largest network of independent distributors/wholesalers, numbering approximately 600. Almost all of the distributors are independent, and operate under exclusive agreements with Anheuser-Busch in which they agree not to deal with any products of any competitor of Anheuser-Busch and not to distribute any products outside of their own designated territories.

39.     Anheuser-Busch sells nearly 70 percent of the company's volume through wholesalers. Anheuser-Busch also owns 13 company-owned distributors/wholesale operations.

40.     Anheuser-Busch sold 104.4 million barrels of beer to United States wholesalers in 2007.

41.     The most influential factor in the sale of beer in the United States is advertising.

42.     Anheuser-Busch is a substantial advertiser, spending approximately $378 million last year alone, more than the combined spending of its main actual competitors in the United States, Miller Brewing Company and Molson Coors Company.

43.     Anheuser-Busch employs over 30,000 full-time employees worldwide.

**Defendant InBev**

44.    InBev is a company organized under the laws of Belgium with its principal place of business in Leuven, Belgium. It is the largest brewer of beer in the world. Several of InBev's brands, including Stella Artois, are imported into the United States by Anheuser-Busch and distributed by Anheuser-Busch distributors pursuant to a distribution agreement with Anheuser-Busch.

45.    InBev was created from a series of mergers and acquisitions culminating in the merger between Belgium's Interbrew and Brazil's AmBev. Together, the founding families of InBev's predecessor companies in Belgium and Brazil own 52% of InBev's stock, and they have entered into a 20-year agreement which entitles them to appoint a majority of InBev's Board of Directors. Only a minority stake of InBev is publicly traded on the Sao Paulo, Brazil and New York Stock Exchanges.

46.    InBev's current North American business includes operations in Canada (Labatt Brewing Company) and, through a distribution agreement with Anheuser-Busch, the United States (InBev International and Labatt USA), and also includes a joint venture between InBev and the Cuban government (Bucanero S.A.), through which InBev brews, imports, sells, and exports a variety of beer under the Bucanero, Cristal and Mayabe brands as well as its Beck's brand. InBev's Cuban operations account for 44% of the Cuban beer market.

47.    InBev is the world's largest brewer with 123 breweries across the globe. It employs an estimated 89,000 people worldwide. Its flagship brands which are easily recognized by consumers in the United States include Stella Artois, Brahma and Beck's.

48.    Anheuser-Busch is the exclusive importer of InBev's products in the United States.

49.     By virtue of its assets, position and financial capabilities, InBev exerts pro-competitive and beneficial influence on the marketing of beer in the United States, even though it has not as yet entered the United States on its own de novo as an actual competitor.

50.     InBev has the ability and interest to enter into the United States beer market in a highly competitive fashion including the construction of breweries and the development of its own independent distribution network.

51.     InBev has operations around the world and internally divides its operations into six regions:  North America, Western Europe, Central and Eastern Europe, Asia Pacific, Latin America North and Latin America South.

52.     One if its regions is North America, where it sells Labatt Blue, the number one Canadian brand in the world.

53.     Budweiser is the largest selling brand in Canada.

54.     The North American region includes both Canada and the United States. InBev has eight breweries in Canada.

55.     InBev does not presently operate any breweries in the United States. InBev exports the Beck's and Stella Artois brands to the United States.  InBev trades in the United States through an exclusive distribution agreement with Anheuser-Busch.

56.     InBev also owns Labatt USA and markets Beck's and Stella Artois throughout the United States through Anheuser-Busch distributors.

57.     InBev sells the number one (#1) or number two (#2) beers in over 20 key beer markets throughout the world.

58.     InBev is the number one (#1) seller in the following countries:  Canada, Brazil, Bolivia, Paraguay, Uruguay, Argentina, Belgium, Luxembourg, Croatia, Serbia, Montenegro, and the Ukraine; and the Number Two seller in Cuba, the Dominican Republic, Guatemala, Ecuador, Peru, Chile, Netherlands, Germany, Bulgaria, the Czech Republic, Russia and South Korea.

## History of InBev and InBev's Expansion into the American Market

59.     Prior to forming InBev in the merger of Belgium's Interbrew and Brazil's AmBev in 2004, the world's largest brewers were: (#1) Anheuser-Busch; (#2) SABMiller; (#3) Interbrew; (#4) Heineken, and (#5) AmBev.  After the combination of Interbrew and AmBev, InBev became the largest brewer in the world.

60.     At the time, well-recognized Interbrew brands were Stella Artois, Boddingtons, Beck's, Labatt and Bass Ale.  In 2001, Interbrew, Danone (former owner of Kronenbourg), and two other brewers were fined 91 million Euros for operating a cartel in Belgium.

61.     AmBev was a Brazilian beer company formed in 1999 between Brahma and Antarctica breweries.  It had a dominant position in South America and the Caribbean.

62.     When Interbrew and AmBev combined in 2004, it was then represented publicly by AmBev's CEO Carlos Brito, InBev's present CEO, that the two companies would "operate independently in different hemispheres…" However, after the combination, Mr. Brito changed his mind and decided AmBev would expand its reach from South America into Interbrew's territories in Mexico and North America, and Interbrew would oversee operations in Europe and Asia.

63.    InBev is ready, willing and able to enter the United States market.

64.    Anheuser-Busch perceives and understands and believes that InBev is ready, willing and able to enter the United States market, and so represented to the United States District Court.

65.    As the world's largest brewer, InBev has enormous economic capabilities. Its 2007 market capitalization is in excess of $50 Billion, with net profits of $7.8 Billion from revenues exceeding $21 Billion.

66.    InBev's enormous economic capabilities are also demonstrated by its ability to pay $52 Billion in cash to acquire Anheuser-Busch.

67.    InBev, by reason of its enormous economic capabilities, is more than able to enter the United States market de novo and build new breweries, create new jobs, and establish its own and new distributors to market its products, which already have a market presence in the United States by reason of its agreements with Anheuser-Busch to divide markets.

68.    Prior to this attempt to acquire Anheuser-Busch, InBev stated unequivocally that it intended to become a "player" in the production and sale of beer in the United States. Only eight months after the merger of AmBev and Interbrew, forming InBev, Mr. Brito stated his intention to shortly "complete our dream of becoming a pan-America player."

69.    InBev has announced to competitors and to the public alike that it intends to be an entrant into the United States market for the production and sale of beer.

70.    Mr. Brito, the former co-CEO of AmBev, took on the role of InBev North American Zone President.  Then, just ten months after the creation of InBev, he replaced John Brock, former Interbrew CEO, as the CEO of InBev.

71.    Since at least 2004, InBev, as led by former AmBev officers, has had a long-term goal of becoming a major player in the production and sale of beer in the United States market.

72.    InBev's strategy began with the Interbrew-AmBev merger, and it then negotiated a distribution contract with Anheuser-Busch for the distribution of InBev premium brands Stella Artois, Beck's and Bass in the United States.

73.    InBev has even stated in press releases as recently as 2007 that it's "strategy is to strengthen its local platforms by building significant positions in the world's major beer markets".

74.    InBev is the number one (#1) or number two (#2) seller in more than 20 key markets around the world, mainly Europe and South America.  Anheuser-Busch is the number one (#1) seller in the United States with 48.5% of the total U.S. beer sales.

75.    The total volume of billions of gallons sold by InBev in the world is 7.15 Billion gallons.  The total volume of billions of gallons sold by Anheuser-Busch in the world is 3.99 Billion gallons.

76.    The total number of brands sold by Anheuser-Busch is over 100.

77.    The total number of brands sold by InBev is over 200.

78.    The total number of breweries by Anheuser-Busch is 27.

79.    The total number of breweries by InBev is 123.

## NATURE OF TRADE AND COMMERCE

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

15

80.    The relevant product and geographic market is the production and sale of beer in the United States.

81.    The United States is the world's most profitable beer market.

82.    The number of brewers operating plants in the United States has decreased markedly for decades, resulting in a highly concentrated market.

83.    While the number of national brewers has substantially declined, the volume of beer in the industry over the last ten years has increased by more than 10% from 198 million barrels to 218 million barrels.

84.    Anheuser-Busch dominates the production and sale of beer in the United States.

85.    Anheuser-Busch has 48.2% of the beer market in the United States.  This is more than the combined total of the next ten closest competitors.

86.    SABMiller from the United Kingdom has 18.4% of the beer market in the United States.

87.    Coors has 11.1% of the beer market in the United States.

88.    Crown (Barton) has 5.4% of the beer market in the United States.

89.    Heineken has 4.1% of the beer market in the United States.

90.    Pabst has 2.8% of the beer market in the United States.

91.    Diageo/Guinness has 1.5% of the beer market in the United States.

92.    Yuengling has .8% of the beer market in the United States.

93.    Labatt USA has .7% of the beer market in the United States.

94.    Gambrinus has .2% of the beer market in the United States.

95.     All other producers of beer including craft beer and micro brewers have 6.2% of the beer market in the United States.

96.     The top brewers in the world are: Anheuser-Busch/InBev, if the acquisition should go forward, a Belgium company; second largest would be SABMiller, a United Kingdom company; the third largest would be Heineken, a Netherlands company; and the fourth largest would be Carlsberg, a Denmark company.

97.     Recently SABMiller and Coors Molson have combined their marketing in the United States with a combined market share of 29.5%.

98.     In light of the combination of SABMiller and Coors Molson, the proposed acquisition by InBev would result in a market share of 80% control by just two companies, both foreign corporations.

99.     Anheuser-Busch and InBev are substantial and significant potential competitors in the United States.

100.    Anheuser-Busch and InBev are potentially able to provide competing products against each other anywhere in the United States, North America and the world.

101.    The behavior of each is therefore constrained by actual and potential competition from the other throughout the entire relevant market.

102.    The market for the production and sale of beer in the United States is in and part of interstate commerce, makes extensive use of the instrumentalities of interstate commerce, and substantially affects interstate commerce.

103.    The production and sale of beer are in a continuous and uninterrupted flow of interstate commerce. Materials used in the production of beer are purchased and shipped in a continuous and uninterrupted flow of interstate commerce.

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

17

104.   National brewers possess significant competitive advantages over smaller or regional brewers. They are able to advertise on a nationwide basis, have greater prestige, larger distribution networks, and are less affected by weather and labor issues.

105.   Any restraint of trade in the beer sales market in the United States, including the restraints specifically alleged in this Complaint, directly and substantially restrains and affects interstate commerce.

## CHRONOLOGIAL FACTS OF OFFERS, REJECTIONS AND ACCEPTANCE

106.   On June 2, 2008, representatives of InBev met with the CEO of Anheuser-Busch, August A. Busch, IV, in Tampa, Florida to discuss the possible acquisition of Anheuser-Busch by InBev. At that time, the CEO of Anheuser-Busch asked the InBev representatives to send a formal proposal to him and the Anheuser-Busch board of directors.

107.   At that time it was represented that an acquisition of Anheuser-Busch by InBev would be "an industry transforming event."

108.   On June 11, 2008, InBev announced that it had made a proposal to the Board of Directors of Anheuser-Busch to acquire the company, which would result in the largest brewer in the world.

109.   The proposed new company, on a pro forma basis for 2007, would generate beer volumes of 460 hectoliters [one hectoliter equals approximately 26.5 gallons], net sales of $36.4 Billion and EBITDA of $10.7 Billion. The offered price was $65 per share (approximately $46 Billion), the largest cash offer ever made for an acquisition of a competitor, representing a 35% premium over Anheuser-Busch's stock price.

110.    The proposal attempted to create the largest brewer in the world.

111.    In a June 11, 2008 press release, Anheuser-Busch acknowledged receipt of InBev's proposal and said that it would consider it.

112.    On June 12, 2008 InBev announced that it would host a webcast discussion with regard to the proposed combination with Anheuser-Busch.

113.    Between June 11 and June 15, 2008 Anheuser-Busch considered purchasing the remaining interest it did not own in Modelo, the Mexican brewing company, in order to thwart the effort by InBev to buy Anheuser-Busch.

114.    On June 15, 2008 InBev sent a second letter to the Board of Directors of Anheuser-Busch in which it threatened the board that any transaction with Modelo could result in "potential adverse consequences ... [to] your shareholders ...."

115.    On June 16, 2008 Anheuser-Busch acknowledged receipt of InBev's letter.

116.    On June 20, 2008 Anheuser-Busch advised InBev that it had not made a decision. On the same date, the Chairman of Modelo resigned from the Board of Directors of Anheuser-Busch.

117.    On June 25, 2008 InBev sent a third letter reconfirming its commitment, advising that it had spent $50 Million in commitment fees already, and that the combination would be "an industry-transforming event." It claimed that there would be "synergies" by sharing "best practices, economies of scale and rationalization of overlapping corporate functions."

118.    On June 26, 2008 Anheuser-Busch unanimously rejected the InBev proposal making the following statements:

"As you state in your letter, there is limited overlap in our respective businesses. Many of the suggested synergies seem not to be synergies at all, but are instead profit enhancements. We believe that we can deliver similar enhancements to our shareholders independent of a transaction, and have included these enhancements in our accelerated earnings growth plan.

****

From the standpoint of the Anheuser-Busch shareholder, however, a transaction with InBev at this time would mean foregoing the greater value obtainable from Anheuser-Busch's strategic growth plan. We are convinced that pursuing our program will enable Anheuser-Busch shareholders, rather than InBev shareholders, to realize the inherent value of Anheuser-Busch."

119.    The letter also noted that Anheuser-Busch had planned on over $1 Billion in savings through 2010 on its own cost cutting program.

120.    On the same date, June 26, 2008, InBev responded by filing a lawsuit in the Delaware Chancery Court in an effort to remove the members of the Board of Directors of Anheuser-Busch and replace them with its own board. InBev noted that the cost plan of Anheuser-Busch had "significant execution risks." InBev warned that it would "pursue all available avenues" to acquire Anheuser-Busch.

121.    On July 7, 2008 Anheuser-Busch countered by calling InBev's lawsuit "self-serving" in an effort "to transfer the company's value from Anheuser-Busch's shareholders to InBev's shareholders." Anheuser-Busch stated that it created "a plan that it believes will produce value superior to InBev's non-binding proposal."

122.    On the same date, Monday, July 7, 2008, Anheuser-Busch filed a complaint in the Federal Court in St. Louis, Missouri. In the complaint, Anheuser-Busch made the following charges which it asserted to the Federal Court were true:

      1)      That the InBev proposal was "an illegal plan and scheme by InBev, through a course of deceptive conduct, to acquire control of Anheuser-Busch …."

      2)      That "InBev has also made false and misleading statements about its purported plan for operating Anheuser-Busch after the proposed acquisition."

      3)      That InBev failed "to disclose what changes it will make to the company's business and operations to justify financially the proposed acquisition."

      4)      That "InBev's scheme was conducted through the dissemination of false and/or misleading statements …."

      5)      That "although InBev is one of the top beer brewers in the world, it has just a fraction of the U.S. beer market ….in an effort to increase its growth, InBev has made public its desire to broaden its share of the U.S. beer market."

      6)      That, as stated by Anheuser-Busch in its complaint in bold and capital letters, "**INBEV'S STATEMENTS ABOUT COST CUTTING AND FUTURE PLANS ARE FALSE AND MISLEADING.**"

      7)      That "InBev has run out of places to cut costs in its current operations and has set its sights on Anheuser-Busch as a new source of significant costs savings and a way to maintain its growing margins and earnings, …, even without increasing its sales."

    123.     On or about July 11, 2008, in an abrupt turnaround, sparked by the prospect of additional millions of dollars to the individual members of the Board of Directors of Anheuser-Busch, August Busch IV and other officials met with Carlos Brito and others at law offices in New York and agreed in principal to the acquisition for $52 Billion.

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

21

124. On or about July 12 or 13, 2008, the executives of both companies met in an airplane hanger in New Jersey to attempt to finalize an agreement to form the combination.

125. On July 14, 2008, Anheuser-Busch in Missouri and InBev in Belgium issued a joint press release stating that they had agreed to combine "creating the global leader in beer."

126. The amount of the offer had been increased to $70 per share, bringing the total purchase price in cash to $52 Billion, the most ever paid in any acquisition ever.

127. The press release stated as true that approximately "40% of the combined companies revenues would be generated in the United States."

128. The press release also stated as true that InBev's board of directors would be increased by two to accommodate a minority position for August Busch IV and one other current or former director from the Anheuser-Busch board.

129. The press release also stated as true that the combine would have "leading positions in the world's top five markets—China, U.S., Russia, Brazil and Germany," and result in "opportunities for leveraging the companies combined brand portfolio, ... , maximizing the combinations unparalleled global distribution network ...."

130. The press release stated that "Budweiser and Bud Light are the largest selling beers in the world, and the combined company will have an unmatched portfolio of import local premiums and local core brands."

131. The press release provided a quote from August Busch IV in which he stated "we will leverage our collective strengths ...." Furthermore, the press release stated as true that "Anheuser-Busch's partners fit well with InBev's global franchise.

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

22

Anheuser-Busch has equity investments in two companies with strong brands in two key markets: Mexico's Grupo Modelo, which owns Corona Extra, the number five brand globally; and China's Tsingtao, the leading Chinese premium brewer."

### *Price Increases as a Result of Acquisition*

132.    The press release explicitly stated the intention to increase prices: "The transaction creates significant profitability potential both in terms of revenue enhancement and cost savings."

133.    On the very next day after the announced deal, Chief Executive Officer August Busch IV, Chief Executive Officer Carlos Brito, and David Peacock the Vice President of Marketing, held a teleconference with Anheuser-Busch wholesalers.

134.    The teleconference was recorded.

135.    At the teleconference, in response to a question regarding wholesaler profitability, Mr. Brito stated that both the new company and the wholesalers should get "that extra buck" in the marketplace—"get our niche to approve the marketplace, sell higher, *at higher prices*, higher value added products ...."

136.    Mr. Brito's statement was followed by a statement by Mr. Peacock, Vice President for Marketing for Anheuser-Busch stating that "we talked about a very good fourth quarter price increase. We look at beer pricing still right now below Food and beverage CPI. We know there is room there. We understand the consumer is getting pressure, especially the blue-collar consumer, but it is our belief that the pricing will hold, will be accepted, and the initial discussions with retailers indicate the same. And we think that the yield from price increases will be enough to offset some of the fuel increases-more than enough when you look at fuel as being about 7% of a wholesaler's

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

23

costs centers. I don't think in the short term that will change. Obviously as we change and form the new company we will be working collectively to figure out the right plan for the market and continue to invest behind the brand."

137.   In a National Press Release dated July 23, 2008, Anheuser-Busch made good on its promise to increase prices. The Press release stated in relevant part:

> The U.S. beer pricing environment remained favorable through the important Memorial Day and Fourth of July holidays, as expected. The company plans to implement price increases on the majority of its U.S. beer volume in September and October. These pricing initiatives will cover approximately 85 percent of the company's domestic volume and will be tailored to selected markets, brands and packages.
>
> "The company's new Strategic Plan expands and accelerates our cost reduction and operating efficiency initiatives generated by our Blue Ocean project, as well as our planned price increases. These initiatives, combined with our increased marketing and selling efforts, are all contributing to our very strong outlook for profit growth," said Mr. Busch IV.

138.   The acquisition immediately sought to obtain the fruits of increased market power and the reduction in competition, and consequent increase in prices and profits. It is for this reason –to obtain the benefits of the reduced competition --that InBev is willing and able to pay a premium price over the market value of Anheuser-Busch stock. While certain investors and Directors of Anheuser-Busch were to benefit financially, the consumers would pay the price.

139.   In the absence of the proposed acquisition, InBev will probably enter the United States market de novo.

140.    In the absence of the acquisition, InBev will probably establish a new distribution network in the United States wholly apart from the Anheuser-Busch distribution network.

141.    In the absence of the acquisition InBev will probably build new breweries wholly apart from Anheuser-Busch's breweries.

142.    In the absence of the acquisition InBev will probably lower prices or call to others not increase their prices.

143.    In the absence of the acquisition InBev will increase jobs, diversity of products for consumers, and create a new competition in the beer industry in the United States for the benefit and welfare of consumers.

144.    In the absence of the acquisition the ownership of Anheuser-Busch will not be transferred to foreign owners.

145.    In the absence of the acquisition, none of the local regional and national activities and support given by Anheuser-Busch will be eliminated.

### *Increasing Concentration in the American Beer Industry*

146.    The pattern of attempted horizontal consolidation in the beer industry has been ongoing for decades.  Few if any industries have undergone such a remarkable change in the post-World War II era.  To illustrate, during the period 1947-1995, the number of brewing companies dropped by 90%.

147.    By 2002, the number of "traditional" brewers had dropped from 421 to just 22.  By the year 2001, the top five beer producers accounted for 87% of the country's barrelage.  In 1947 the HHI was 140.  By 2001 it had spiraled to over 2,900.

148.    By 2003, the top three firms accounted for over 80% of the market: Anheuser-Busch at 48.5%; Miller at 18.9% and Coors at 11%. If the acquisition goes forward the top two firms will have 80%, with Anheuser-Busch/InBev the dominant participant with 50% of the market.  At that time the HHI was 3,025.

149.    Today, the top two firms, Anheuser-Busch and the Miller/Coors combine, account for 80% of the market.

150.    If the acquisition goes forward, and InBev is allowed to simply purchase Anheuser-Busch, no competition will be added; substantial potential competition will be eliminated; and the United States beer market will be completely controlled by the founding families of InBev in Belgium and Brazil.

**SABMiller and Molson Coors**

151.    On or about October 9, 2007, SABMiller and Molson Coors announced the "MillerCoors joint venture" for Puerto Rico and the United States.  SABMiller plc is one to the world's largest brewers, with brewing interests or distribution agreements in over 60 countries across six continents. The group's brands include Miller Genuine Draft, Grolsch and Pilsner Urquell.  Miller produces, markets and sells the Miller portfolio of brands in the United States.

152.    Molson is one of the world's largest brewers operating in Canada through Molson Canada and in the United States through Coors Brewing Company.  Its brands include Molson, Carling, Coors and Keystone Light. It operates in the United States through Coors Brewing Company.  Coors produces, markets and sells the Coors portfolio of brands in the United States and Puerto Rico.  The Coors contribution to the "Joint venture" includes the sale of Molson Coors brands in the United States and Puerto Rico.

153.   Under the SABMiller "joint venture," the Miller business to be contributed to the joint venture does not include the sale of Miller brands outside of the United States but does include the sale of SABMiller brands in the United States.

154.   Because of the Miller/Coors "joint venture," the Herfindahl-Hirschman Index, which before was in excess of 2,800, is now at 3,250. As a result, the probability of price-fixing and division of markets among the breweries remaining after Defendants' acquisition would substantially increase. If the InBev/Anheuser-Busch transaction were to be consummated, the HHI would reach in excess of 3,650.

155.   For all intents and purposes approximately 80% of the market would rest in the hands of *two companies*: InBev/Anheuser-Busch and Miller/Coors. However, if the acquisition were allowed, InBev/Anheuser-Busch would be by far the dominant company in the United States and around the world by reason of its economic strength, and would be able to exercise monopoly power in the production and sale of beer in the United States.

156.   The potential for increased price-fixing, division of markets, suppression of smaller competitors, and other anti-competitive acts, among the remaining breweries is significant and probable.

157.   In addition to the degree of market concentration, there are significant barriers to entry in the relevant market, as well as a history of a lack of successful new entry. To the contrary, the relevant market has been characterized by the exit, rather than the entry, of breweries. As a practical matter, InBev's interest in and ability to enter the relevant market is *sui generis*. The unlikely prospect of new national entry by others is therefore unlikely to eliminate any of the anticompetitive effects that will eventuate from

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

27

the Defendants' acquisition and the increasingly concentrated structure of the relevant market.

158.   The proposed acquisition by InBev will cause harm to consumers, including Plaintiffs, by charging higher prices for beer and diminishing competition. Consumers, including the Plaintiffs, will thus pay more for beer than would be the case in the absence of Defendants' acquisition.

159.   The proposed acquisition is also likely to lead to other combinations and further concentration in the already highly concentrated relevant market.

### *Public Concerns*

160.   This transaction is clearly one that is both high profile and of great concern to many that it is anti-competitive.

161.   Missouri Governor Matt Blunt opposed the combination of InBev and Anheuser-Busch. In a letter to the United Stated Federal Trade Commission ("FTC") Chairman William Kovacic, Governor Blunt expressed his concern that the acquisition would result in more than half the beer sold in the United States being controlled by a single company. Governor Blunt stated that:

> "The proposed foreign acquisition of Anheuser-Busch is troubling to me because it potentially raises antitrust issues under existing law by putting significant market share of the U.S. in the hands of few competitors."

He further affirmed his concerns that the sale "would have destabilizing impacts on our nation and [Missouri]'s long-term economic interests." Governor Blunt has also directed Missouri's Department of Economic Development to "explore every option and any opportunity we may have at the state level to help keep Anheuser-Busch where it belongs—in St. Louis."

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

28

162.    On or about June 12, 2008, United States Senator Kit Bond (R-Missouri)

wrote a letter to FTC Chairman Kovacic, as well as United States Attorney General

Michael Mukasey, asking them to investigate the proposed acquisition. The letter stated:

> Dear Attorney General Mukasey and Chairman Kovacic:
>
> Yesterday, it was announced that a Belgium company InBev, had made a bid to acquire an American company, Anheuser-Busch, which is based in the State of Missouri. The community I represent is adamantly opposed to this acquisition. The proposed foreign acquisition of Anheuser-Busch is troubling to me because it potentially raises antitrust issues under existing law by putting a significant market share of the U.S. in the hands of fewer competitors. I urge you to scrutinize closely InBev's proposed acquisition of Anheuser-Busch to protect the interests of American consumers and the U.S. economy.
>
> As an American brewing company for over 150 years, Anheuser-Busch has been an iconic symbol of the United States and our heritage. Consumers throughout Missouri and the Nation have benefited from the many products provided by Anheuser-Busch throughout its history and as one of the largest beer manufacturers in the U.S., it plays a significant role in our Nation's economy. Further, the company, based in St. Louis, Missouri, is a major driver in the local, state and even national economy up and down the supply chain. Service to Missouri is not limited to the thousands employed or the immeasurable businesses that serve as suppliers to the company, it is also a major force for charitable and civic endeavors in the community.
>
> It already is clear that the local sentiment is adamantly opposed to yielding control and threatening operations that have been beneficial to consumers, workers, American communities, and shareholders alike. That sentiment intends to be active, is growing by the moment, and is a sentiment I share.
>
> Thank you for your attention and scrutiny to InBev's proposed acquisition of Anheuser-Busch and ensuring that the interests of Missourians and Americans are properly protected.

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

29

163.    On or about June 17, 2008 Senator Bond was reported as stating: "this (deal) is a bad idea. It is broadly opposed by the community and I look forward to expressing strong opposition tomorrow."

164.    In June 2008, United States Senator Claire McCaskill (D-Missouri) stated "I will do everything I could to stop this sale from going through." The Senator also said "This is not a company that's in stress and has provided good middle class jobs."

165.    On June 18, 2008, after previous meeting with InBev CEO Carlos Brito, Senator McCaskill wrote a letter to the Board of Directors at Anheuser-Busch Companies, stating:

> As you know, InBev has submitted an unsolicited offer for the acquisition of Anheuser-Busch, Inc. The offer and supporting materials from InBev are before you for review and consideration. I write to urge that as you examine the financial aspects of the offer, you also consider what this great and profitable company represents to St. Louis, the state of Missouri, and the rest of America. In doing so, I hope you will reject the purchase offer.

> Since its founding over 150 years ago, Anheuser-Busch and its family of beers have become synonymous with American ingenuity, quality, and excellence. Budweiser is recognized as "The King of Beers" not because of the company's market capitalization, annual earnings, or the value of its assets. It is based upon the tremendous pride from a dedicated workforce to sustain a company that has come to define us as a country. This commitment is an intangible that cannot be valued on a spreadsheet or ledger, but it is part of Anheuser-Busch's success as our country's largest brewer.

> You have a fiduciary duty to the company and its shareholders, and I have tremendous respect for your wisdom as business leaders. My hope is that you will look beyond a cold calculation of the "bottom line" of the InBev offer, and identify what steps Anheuser-Busch can take to allow for its continued growth, while retaining its uniquely

> American heritage. Clearly, if this sale is allowed to occur,
> major changes in this company, its marketing, its
> workforce, and its culture would be necessary. While
> Anheuser-Busch must continue to work on cost-cutting and
> growth, the dramatic steps that would be necessary to make
> this deal work would be a big negative to the community.
> Do not hesitate to contact me to discuss ways that I and
> community leaders can work with you to improve the
> company without changing its ownership.

166.    As the foregoing paragraphs show, the effect of the InBev acquisition, if consummated, may be substantially to lessen competition, or tend to create a monopoly in the production and, sale of beer in the United States by eliminating InBev as an actual or potential competitor and giving to the new company monopoly power and the likelihood of collusion.

167.    By reason of the Defendants' proposed acquisition, Plaintiffs are threatened with loss or damage in the form of higher beer prices and diminished competitive options. If Defendants' acquisition is consummated, Plaintiffs will sustain irreparable harm for which damages will be unable to compensate Plaintiffs, in that competition once lost cannot easily be restored. Accordingly, Plaintiffs bring this action for both preliminary and permanent injunctive relief against the InBev acquisition.

## VIOLATIONS ALLEGED

### Section 7 of the Clayton Antitrust Act, 15 U.S.C. §18

168.    Plaintiffs incorporate and reallege paragraphs 1 through 167 above.

169.    The conduct of InBev and Anheuser-Busch described hereinabove, specifically the agreement to allow InBev to purchase Anheuser-Busch for $52 Billion, constitutes a violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, in that the effect of the proposed acquisition may be substantially to lessen competition, or to

tend to create a monopoly in the production and sale of beer in the United States. By reason of the violation plaintiffs are threatened with loss or damage in the form of higher beer prices and diminished competition, as well as irreparable harm for which damages will be inadequate to compensate plaintiffs, such that plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief to prohibit the defendants' acquisition, and to recover their costs of suit, including a reasonable attorney's fee.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand the following relief from this Honorable Court:

A.    Declaring, finding, adjudging, and decreeing that the agreement between InBev and Anheuser-Busch proposing that InBev purchase Anheuser-Busch violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.

B.    Preliminarily enjoining defendants from consummating their acquisition during the pendency of this action.

C.    Permanently enjoining defendants from consummating their acquisition.

D.    Awarding to plaintiffs their costs of suit, including a reasonable attorney's fee, as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

E.    Granting to plaintiffs such other and further relief to which they may be entitled and which the Court finds to be just and appropriate.

Dated: September 10, 2008

LAW OFFICES OF THEODORE F. SCHWARTZ

By: _____
    Theodore F. Schwartz

*COMPLAINT FOR INJUNCTIVE RELIEF TO PROHIBIT THE ACQUISITION OF ANHEUSER-BUSCH BY INBEV AS A VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT 15 USC §18*

32

Theodore F. Schwartz (Federal Bar No. 6467, MO
SBN 17995)
Kenneth R. Schwartz (Federal Bar No. 56194, MO
SBN 44528)
**LAW OFFICES OF THEODORE F.
SCHWARTZ**
230, South Bemiston, Suite 1010
Clayton, MO 63105
Telephone: (314) 863-4654
Facsimile: (314) 862-4357
Email: theodore@schwartz-schwartz.com

Joseph M. Alioto (CA SBN 42680)
Theresa D. Moore (CA SBN 99978)
Joseph M. Alioto, Jr. (CA SBN 215544)
Thomas P. Pier (CA SBN 235740)
**ALIOTO LAW FIRM**
555 California Street, Suite 3160
San Francisco, California 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
E-Mail: esexton@aliotolaw.com

Gilmur R. Murray (CA SBN 111856)
Derek G. Howard (CA SBN 118082)
**MURRAY & HOWARD, LLP**
436 14th Street, Suite 1413
Oakland, California 94612
Telephone: (510) 444-2660
Facsimile: (510) 444-2522
Email: dhoward@murrayhowardlaw.com

*Attorneys for Plaintiffs*