UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MARTY GINSBURG, et al., | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:08CV1375 JCH |
| | ) | |
| INBEV NV/SA, et al., | ) | |
| | ) | |
| Defendant(s). | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Judgment on the Pleadings, filed

on February 17, 2009 (Doc. No. 139).  The matter is fully briefed and ready for disposition.

## BACKGROUND

In this purported class action, Plaintiffs claim to be a group of Missouri beer consumers and

purchasers that oppose the proposed merger of Anheuser-Busch ("A-B")[1] and InBev NV/SA

("InBev").  The Complaint alleges that the proposed merger between InBev and A-B violates Section

7 of the Clayton Act because it would eliminate InBev as a "perceived" and "actual" potential

competitor in the United States ("U.S.") beer market.  Plaintiffs allege that InBev was poised to enter

the U.S. beer market *de novo* by constructing domestic breweries and a nationwide distribution

network prior to the merger.  (Complaint ("Compl."), Doc. No. 1, ¶¶ 14, 17, 50, 67).

## LEGAL STANDARD FOR MOTION FOR JUDGMENT ON THE PLEADINGS

Judgment on the pleadings is appropriate only when there is no dispute as to any material facts

and the moving party is entitled to judgment as a matter of law.  Porous Media Corp. v. Pall Corp.,

---

[1]Defendants Anheuser-Busch Companies, Inc. and Anheuser Busch, Inc. are referred to
collectively as Anheuser-Busch.

186 F.3d 1077, 1079 (8th Cir. 1999); Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990). "A grant of judgment on the pleadings is appropriate 'where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law.'" Poehl v. Countrywide Home Loans, Inc., 528 F.3d 1093, 1096 (8th Cir. 2008) (quoting Faibisch v. Univ. of Minn., 304 F.3d 797, 803 (8th Cir. 2002)). "Federal Rule of Civil Procedure 12(c) requires the court to 'accept as true all factual allegations set out in the complaint' and to 'construe the complaint in the light most favorable to the plaintiff[s], drawing all inferences in [their] favor.'" Ashley County v. Pfizer, 552 F.3d 659, 665 (8th Cir. 2009)(quoting Wishnatsky v. Rovner, 433 F.3d 608, 610 (8th Cir. 2006)); Syverson v. FirePond, Inc., 383 F.3d 745, 749 (8th Cir. 2004).[2]

A well-pleaded complaint need not set forth "detailed factual allegations" or "specific facts" that describe the  evidence to be presented, but must include sufficient factual allegations to provide the grounds on which the claim rests. Gregory v. Dillard's, Inc., 565 F.3d 464, 473 (8th Cir. 2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 ( 2009) (citing Twombly, 550 U.S. at 55.[3]  Further, "only a complaint that states a plausible claim for relief survives a motion" for judgment on the pleadings. Iqbal, 129 S. Ct. at 1950 (Twombly, 550 U.S. at 556). "A district court, therefore, is not required to divine the

---

[2]A court reviews a 12(c) motion under the same standard that governs 12(b)(6) motions. Westcott v. Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990).

[3]Plaintiffs argue that the motion to dismiss standard the Supreme Court announced in Twombly applies only to violations of Section 1 of the Sherman Act. (Plaintiffs' Memorandum in Opposition to Defendants' Motion for Judgment on the Pleadings ("Response"), Doc. No. 155, pp. 8-11).  Subsequent jurisprudence indicates that the holding in Twombly is not so limited.  See Gregory, 565 F.3d at 473; Iqbal, 129 S. Ct. at 1949-50.

litigant's intent and create claims that are not clearly raised, and it need not conjure up unpled allegations to save a complaint." Gregory, 565 F.3d at 473 (internal quotations omitted).

When considering a motion for judgment on the pleadings, the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings. Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999) (citations omitted); Noble Sys. Corp. v. Alorica Cent., LLC, 543 F.3d 978, 982 (8th Cir. 2008); Manion v. Nagin, 394 F.3d 1062, 1065, n . 3 (8th Cir.  2005); Faibisch v. Univ. of Minn., 304 F.3d 797, 802 (8th Cir. 2002) (when deciding Rule 12(c) motions, courts may rely on matters within the public record).

## DISCUSSION

### I.   SECTION 7

Section 7 of the Clayton Act prohibits acquisitions that serve "substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.  Section 7 exists primarily to arrest, at their incipiency, mergers that could produce anti-competitive results. Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1050 (8th Cir. 2000), cert. denied, 531 U.S. 979, 148 L. Ed. 2d 436, 121 S. Ct. 428 (2000).  A violation of Section 7 "can occur when there is a threat or possibility of substantially lessening competition or creating a monopoly." Midwestern Mach., Inc. v. Northwest Airlines, Inc., 167 F.3d 439, 442 (8th Cir. 1999).  "No restraints, monopolies, or substantial lessening of competition need actually occur to violate section 7."  Id.

According to the Complaint, InBev's proposed acquisition of A-B will "substantially lessen competition and/or tend to create a monopoly in the production and sale of beer in the United States." (Compl., ¶ 1; see also id., ¶¶ 166, 169).  Plaintiffs allege that InBev's position on the "periphery of

the market" is an important consideration by U.S. brewers in the pricing and marketing of their products. (Id., ¶ 15). Plaintiffs theorize that, absent the acquisition, InBev will probably (1) enter the U.S. market de novo and (2) establish a new distribution network independent of AB breweries. Plaintiffs allege that "InBev is well equipped and well financed to be able to enter the market de novo, building its own breweries and establishing its own national distribution network." (Id., ¶14; see also id., ¶¶ 140, 141, ). Plaintiffs, however, admit that InBev did not compete directly in the United States beer market prior to merging with A-B. (Id., ¶ 17).[4] Nevertheless, Plaintiffs believe that InBev's position as a "potential competitor" allows it to exercise "substantial influence" on the market behavior of U.S. brewers. (Id.).

## II.     POTENTIAL COMPETITION CLAIMS

A.      Plaintiffs' Perceived Potential Competition Claim Fails Because There is No support for Plaintiffs' Position that InBev was Poised to enter the U.S. Beer Market De Novo.

"[T]he Court has recognized that a market extension merger may be unlawful if the target market is substantially concentrated, if the acquiring firm has the characteristics, capabilities, and economic incentive to render it a perceived potential *de novo* entrant, and if the acquiring firm's premerger presence on the fringe of the target market in fact tempered oligopolistic behavior on the part of existing participants in that market." United States v. Marine Bancorporation, Inc., 418 U.S. 602, 624-625 (1974). "[T]he Court has interpreted § 7 as encompassing what is commonly known as the 'wings effect' -- probability that the acquiring firm prompted premerger procompetitive effects within the target market by being perceived by the existing firms in that market as likely to enter *de novo*." Id., at 625; United States v. Falstaff Brewing Corp., 410 U.S. 526, 532 (1973) ("Entry

_____

[4]Plaintiffs allege that InBev's pre-merger market share was only 0.7% of the United States' market (id. at ¶93), and that the merger with A-B has had no effect on market concentration (id. at ¶ 11). With the acquisition, the Herfindahl-Hersch Index (which measures and grades market concentration) remains the same whether or not InBev acquires A-B. (Compl., ¶¶ 10-11).

through merger by [a company on the fringe that is likely to exercise substantial influence on market behavior], although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because the entry eliminates a potential competitor exercising present influence on the market."). Thus, the question in this case is whether a reasonable participant in the U.S. beer market would have viewed InBev as a potential *de novo* entrant into that market. Falstaff Brewing Corp., 410 U.S. at 533.

Plaintiffs' perceived potential competition claim fails adequately to allege facts to support a claim that any rational market participant would have viewed InBev as a potential *de novo* entrant or as one that had a tempering effect on the market. First, Plaintiffs' allegations are legally insufficient. Plaintiffs allege that InBev's proposed acquisition of A-B will "substantially lessen competition and/or tend to create a monopoly in the production and sale of beer in the United States." (Compl., ¶ 1). Plaintiffs further allege that "[t]he constant threat of InBev, the largest brewer in the world, to enter the market, has a direct and substantial effect and impact on the market behavior of" A-B and other U.S. beer makers. (Compl., ¶19). These allegations are merely legal conclusions and are "not entitled to the assumption of truth." Iqbal, 129 S. Ct. at 1950. This Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1950. Plaintiffs must provide factual allegations to support this claim. Id. at 1949 (quoting Twombly, at 570 ("a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'")). Plaintiffs' Complaint is devoid of alleged facts to support a finding that InBev's presence on the fringe of the U.S. beer market somehow influenced or tempered oligopolistic behavior by the existing U.S. beer market participants. Marine Bancorporation, Inc., 418 U.S. at 625.

Second, based upon the facts alleged, this Court finds that no rational actor would have viewed InBev as a perceived potential competitor prior to the merger.[5]   Although the parties do not dispute that InBev has been an international industry leader for some time, Plaintiffs support their case solely based upon InBev's size and financial strength. (Compl., ¶¶ 6, 14, 19, 65, 67; Response, pp. 16-22).   Plaintiffs allege no facts to detail why InBev would be a perceived competitor when it took no discernable steps to enter the U.S. market prior to the proposed merger.[6]

Plaintiffs' claim that InBev was a perceived potential competitor is implausible based upon the facts alleged.   The facts show that InBev actively withdrew from, rather than pursued, the U.S. market.   Initially, Plaintiffs admit that, prior to the merger, InBev had not been competing directly in the U.S. beer market. (Compl., ¶ 17).   In fact, at the time of the merger, InBev did not own or operate any breweries in the U.S. (Compl., ¶55).   In May 2006, A-B purchased InBev's Rolling Rock brands, which were the only U.S. brands then-owned by InBev.  (InBev's 2006 Annual Report, Doc. No. 53, pp. 8, 22; Doc. No. 56).[7]   InBev's stated purpose in discontinuing its Rolling Rock brand was

---

[5]"Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950 (citation omitted).

[6]The only support Plaintiffs provide to the contrary are vague statements that Plaintiffs assert bolster their theory.  Plaintiffs allege that "[p]rior to this attempt to acquire Anheuser-Busch, InBev stated unequivocally that it intended to become a 'player' in the production  and sale of beer in the United States.  Only eight months after the merger of AmBev and Interbrew, forming InBev, Mr. Brito stated his intention to shortly 'complete our dream of becoming a pan-America player.'" (Compl., ¶68; see also id., ¶12 ("[o]n many occasions, InBev has announced its intention to enter the United States market"); id., ¶ 69).  Although not part of the pleadings and not relied upon by this Court, Defendants have clarified that these statements regarding a Pan American dream referred to InBev's 2004 acquisition of LaBatts. (Response, p. 17; Defendants' Memorandum in Support of Motion for Judgment on the Pleadings ("Memorandum"), Doc. No. 140, p. 17).

[7]This Court takes judicial notice of InBev's press releases and annual reports. See Doc. No. 49, granted on Nov. 12, 2008.  This Court also takes judicial notice of the Department of Justice's approval of the merger and its finding that the merger does not violate Section 7 of the Clayton Act, 15 U.S.C. § 18.  73 Fed.Reg. 71682 (Nov. 25, 2008) (United States v. InBev NV/SA; Proposed Final Judgment and Competitive Impact Statement).  In that action, the DOJ investigated whether "the

part of its "strategic approach to the U.S. market, which is to focus on the high-growth import brands in our portfolio." (Doc. No. 56). In September 2006, InBev announced its plans to complete its exodus from the U.S. and sell its only U.S. brewery in Latrobe, Pennsylvania. (InBev's 2006 Annual Report, pp. 8, 42; Doc. No. 56) InBev stated its desire to focus its U.S. business on "imported brands." (Doc. No. 56) The Court finds it unreasonable for competitors to believe that InBev was poised to enter the U.S. market at the same time as InBev was extricating itself from the U.S. market.

As further evidence that InBev was not in a position to enter the U.S. beer market *de novo*, A-B and InBev entered into a long-term "exclusive" distribution agreement in November 2006 whereby A-B would utilize its network of distributorships to market and sell a variety of InBev's imported beer products in the U.S. (Compl., ¶¶ 46, 48, 55; see also InBev's 2006 Annual Report, Doc. No. 53, p. 8). The distribution agreement made A-B the "exclusive U.S. importer of a number of InBev's premium European import brands including Stella Artois, Beck's Bass Pale Ale, Hoegaarden, Leffe and other selected InBev brands." (InBev's 2006 Annual Report, p. 8; InBev's 2007 Annual Report, Doc. No. 58, p. 11). The advantage of the import agreement to InBev was its "[a]ccess to Anheuser-Busch's sales and distribution system." (InBev's 2006 Annual Report, p. 8).[8] If InBev had contemplated a *de novo* entrance into the U.S. beer market, then it is unlikely (if not

___

proposed acquisition would significantly increase the level and concentration in the market and substantially reduce competition" in three regions of upstate New York. 73 Fed.Reg. 71683; see also 44 U.S.C. § 1507 (2009) ("[t]he contents of the Federal Register shall be judicially noticed and without prejudice to any other mode of citation, may be cited by volume and page number").

[8]Notably absent from InBev's 2006 and 2007 annual reports is any mention of its purported desire or plans to expand *de novo* into the U.S. beer market. Rather, these reports focus on the utilization of their distribution agreement for their import beers. See InBev's 2006 Annual Report, p. 22; InBev's 2007 Annual Report, Doc. No. 58, p. 11("In the U.S., 2007 has been the first year in which our distribution agreement with Anheuser-Busch has been in operation, delivering premium European import brands such as Stella Artois and Beck's to U.S. consumers. ... [W]e are confident that the agreement will enable us to maximize the growth potential of both Stella Artois and Beck's within the U.S. marketplace.").

implausible) that it would have entered into an "exclusive" import agreement.  It is implausible that

InBev would enter or attempt to enter *de novo* a market where it would be precluded from

distributing of some of its most recognized and marketable brands.[9]  Rather, one would expect that

InBev would have focused on building and/or acquiring breweries to brew and distribute its products

domestically.

Plaintiffs also allege that "InBev's presence on the periphery of the market--as a perceived

potential and actual entrant as well as a potential and actual dominant entrant--has been an important

consideration in the pricing and marketing decisions of Anheuser-Busch and other American brewers

or importers in the United States."  (Compl., ¶ 15).  Defendants dispute this allegation and cite to

A-B's announcement of a price increase in the U.S. in April 2008 (prior to the proposed acquisition).

(Doc. No. 57).  Plaintiffs' claim that the merger will increase costs to consumers are mere conclusory

assertions regarding how the acquisition will affect consumers.  See Defendants' Reply Memorandum

in Further Support of Motion for Judgment on the Pleadings ("Reply"), Doc. No. 157, p. 8.  Such

conclusory assertions are insufficient under Twombly, Iqbal, and their progeny to survive Defendants'

Motion for Judgment on the Pleadings.

Further, the case law cited by Plaintiffs fails to support their claim that InBev was a potential

competitor.  In Falstaff Brewing Corp., the Supreme Court held, on direct appeal, that the district

court erred in dismissing the government's claim because it "failed to give separate consideration to

whether Falstaff was a potential competitor in the sense that it was so positioned  on the edge of the

market that it exerted  beneficial influence on competitive conditions in that market."  410 U.S. at

532-33.  The Supreme Court held that "[t]he District Court should therefore have appraised the

---

[9] Interestingly, Plaintiffs acknowledge that distributorship agreements are a successful method of staving off foreign competition.  (Compl., ¶ 7).

economic facts about Falstaff and the New England market in order to determine whether in any realistic sense Falstaff could be said to be a potential competitor on the fringe of the market with likely influence on existing competition." Id. at 533-34.  The Court reversed the district court's dismissal of the government's complaint because it found that there was sufficient circumstantial evidence to support a finding that Falstaff was a potential competitor in the relevant, Northeast market.  The Court found that "Falstaff was in the relevant line of commerce, was admittedly interested in entering the Northeast, and had, among other ways, made its interest known by prior-acquisition discussions." Id. at 536, n. 13.

Applying the analysis from Falstaff Brewing Corp., this Court determines, based upon the pleadings and public records, that InBev was not a perceived potential competitor.  The Court has determined that InBev was not "admittedly interested" in entering the U.S. market, particularly based upon InBev's extrication from the U.S. market.  In sum, Plaintiffs have not identified any indicators that other U.S. beer brewers believed that InBev was poised to enter the United States beer market.

U.S. v. Marine Bancorporation, 418 U.S. 602 (1974) also does not support Plaintiffs' case.  The Supreme Court, affirming the district court's dismissal of the government's complaint after trial, held that the government's theory that the merging bank could have entered the target market *de novo* failed to take into account the extensive and unique federal and state regulatory restraints on entry into banking, particularly government controls over the expansion of banks. Id. at 626-30.  The Supreme Court differentiated the beer industry and the Falstaff Brewing Corp. case based upon its belief that, unlike the highly regulated banking industry, "[b]eer manufacturers are free to base their decisions regarding entry and the scale of entry into a new geographic market on nonregulatory considerations, including their own financial capabilities, their long-range goals as to markets, the cost

of creating new production and distribution facilities, and above all the profit prospects in the target market." Id. at 628-29.

In the present instance, Plaintiffs support their claim primarily with the allegation that InBev has strong financial capabilities. Unlike the situation proposed by the Marine Bancorporation, Inc. Court, the factual allegations and the public records indicate that InBev did not have "long-range goals" to enter the U.S. beer market. In addition, given the exclusive import agreement between InBev and A-B and InBev's sale of its only U.S. brewery, Plaintiffs have alleged no facts to show that such an entry would be plausible, even if desired by InBev.

Thus, the cases cited by Plaintiffs are not persuasive to support their perceived potential competition claim. To succeed, Plaintiffs would have to allege, with sufficient factual support, that it would be reasonable to perceive InBev as a potential entrant into the U.S. beer market. Given the lack of factual allegations to support a finding that U.S. beer makers believed that InBev intended to enter the U.S. beer market, Plaintiffs have failed to demonstrate that there are any "procompetitive effects" present that would be eliminated by the merger of InBev and A-B. Marine Bancorporation, Inc., 418 U.S. at 625. Defendants' Motion for Judgment on the Pleadings is granted.

B.       Plaintiffs' Actual Potential Competition Claim Also Fails.

Plaintiffs' actual potential competition claim likewise fails because Plaintiffs have not alleged sufficient facts to establish that InBev intended to enter the U.S. market *de novo* by constructing new breweries and its own national distribution network. As stated by the Eighth Circuit, the relevant issue is would InBev, absent the acquisition, "probably have entered the U.S." beer market independently, and would this new entry "probably have increased competition" more than the acquisition did. Yamaha Motor Co., Ltd. v. Federal Trade Commission, 657 F.2d 971, 977 (8th Cir. 1981). To state a claim under the "actual potential entrant doctrine," an acquisition is barred "if the

acquisition eliminated the acquired firm as a potential competitor, and if the acquired firm would otherwise have been expected to enter the relevant market *de novo*." Id. There are two preconditions present for an "alleged potential entrant." The alleged potential entrant must have "available feasible means" for entering the market and those means must have a "substantial likelihood" producing anticompetitive effects. Id. (citing Marine Bancorporation, Inc., 418 U.S. at 633).

In Yamaha, the Eighth Circuit affirmed the decision of the federal trade commission that Yamaha's joint-venture agreement was unlawful under the Clayton Act because, at the time of the joint-venture agreement, Yamaha was both an actual and potential competitor of the target company and the joint-venture agreement might have effects that substantially lessen competition. The Eighth Circuit found that Yamaha "had the technology needed to be a viable entrant into the United States market" and significant name recognition. Id. at 978. Yamaha was a "well-established international firm with considerable strength," a familiar brand name, and marketing experience in the U.S. Id. at 979. Yamaha had previously attempted to enter the U.S. market *de novo* on two other occasions. Id. at 974, 978-79. Yamaha did not need to construct new factories or build a nationwide distribution system. Id. at 974, 978. The court also noted that opportunities existed for distributing Yamaha products with dealerships. Id. at 978. The court was also presented objective evidence that Yamaha had a subjective intent to enter the U.S. market. Id. at 978.

The factors present in Yamaha upon which the Eighth Circuit determined that the merger might substantially lessen competition are not present in this case. Here, InBev has no existing breweries or distributorships to produce, promote and distribute its product and enter the U.S. beer market *de novo*. InBev would have to build factories and develop a nationwide distribution system. Instead, InBev entered into a distributorship agreement for its imports, which would hinder its entry

into the U.S. market. Also, as discussed above, there is insufficient objective evidence that InBev had a subjective intent to enter the U.S. market *de novo*. Accordingly, the Court finds that InBev was not an actual potential competitor in the U.S. beer market and grants Defendants' Motion for Judgment on the Pleadings.

## III.    LEAVE TO AMEND

At the conclusion of their Response, Plaintiffs ask for leave to amend their Complaint if this Court determines that Plaintiffs' Complaint fails to state a claim. (Response, p. 30). Plaintiffs' request is improper as it is contained in the conclusion to its Response, not as a separate Motion. Further, due to the extensive and lengthy briefing of all parties as to the legal basis for the claims asserted, this Court declines to grant leave to amend.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Judgment on the Pleadings (Doc. No. 139) is **GRANTED**, and Plaintiffs' claims are dismissed with prejudice. An appropriate Judgment will accompany this Memorandum and Order.

**IT IS HEREBY FURTHER ORDERED** that Plaintiffs' Motion for Public Access to the Court Record (Doc. No. 105) is **DENIED**.

Dated this 3rd  day of August, 2009.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE